**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

-------------------------------------------------------------------X

IN RE SCOTIA DEVELOPMENT, LLC et. al.,

          Debtors.

 :  Bankruptcy Case
   No. 07-20027-C-11
 :
 :
   Jointly Administered
 : (Chapter 11)

-------------------------------------------------------------------X

THE BANK OF NEW YORK, N.A., AS
INDENTURE TRUSTEE FOR THE TIMBER
NOTES,

          Movant,

    v.

MENDOCINO REDWOOD COMPANY, LLC,
MARATHON STRUCTURED FINANCE FUND
L.P., AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, et. al.,

          Respondents.

 :
 :
 :
   Case No. 08-MC-00066
 :
 :
 :
 :
 :

_____X

**MEMORANDUM OF LAW OF RESPONDENTS MENDOCINO
REDWOOD COMPANY, LLC, MARATHON STRUCTURED FINANCE
FUND L.P. AND THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN OPPOSITION TO THE EMERGENCY MOTION OF
THE INDENTURE TRUSTEE FOR A STAY PENDING APPEAL OF
THE BANKRUPTCY COURT'S ORDER CONFIRMING THE
MRC/MARATHON PLAN OF REORGANIZATION**

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

THE MRC/MARATHON PLAN .............................................................................. 4

STANDARD OF REVIEW....................................................................................... 5

ARGUMENT .......................................................................................................... 7

I.    THE INDENTURE TRUSTEE HAS FAILED TO SATISFY THE
    NECESSARY CRITERIA FOR A STAY PENDING APPEAL........................................7

   A.   The Debtors, Their Estates And Creditors Will Suffer Substantial
       And Irreparable Harm If A Stay Is Imposed....................................................7

      1.    A Lack Of Operating Funds Will Result In Liquidation .......................7

      2.    The MRC/Marathon Plan Would Collapse ........................................ 10

   B.   The Public Interest Does Not Favor A Stay ................................................. 12

   C.   The Indenture Trustee Cannot Demonstrate Irreparable Harm ........................ 14

   D.   Balancing the Equities..................................................................................... 16

   E.   The Indenture Trustee Cannot  Demonstrate A Substantial Likelihood
       That Its Appeal Will Succeed On The Merits................................................. 16

      1.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating
          That The MRC/Marathon Plan Could Not Be Crammed Down
          Over Its Objection................................................................................ 18

          (a)   The Indenture Trustee Cannot Demonstrate That The
               MRC/Marathon Plan Does Not Provide The Noteholders
               With The  Indubitable Equivalent Of Their Secured Claim ...................... 18

          (b)   The Indenture Trustee Cannot Demonstrate That
               The Noteholders Have the Right to Credit Bid........................................22

      2.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating
          That The MRC/Marathon Plan Failed To Comply With The Absolute
          Priority Rule ....................................................................................... 26

      3.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating
          That The MRC/Marathon Plan Improperly Substantively Consolidated
          The Debtors....................................................................................... 28

Table of Contents
(continued)

Page

4.    The Indenture Trustee Is Not Likely To Succeed In  Demonstrating
      That The MRC/Marathon Plan  Fails To Pay Intercompany
      Administrative Claims .......................................................................................29

5.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That
      The MRC/Marathon Plan Fails To Provide The Indenture Trustee With
      At Least As Much As It Would Receive In a Chapter 7 Liquidation..................29

6.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That
      The MRC/Marathon Plan Improperly Classifies Unsecured Claims ..................31

7.    The Indenture Trustee Is Not Likely To Succeed In  Demonstrating That
      The MRC/Marathon Plan Discriminates Unfairly Against Class 9 .....................33

8.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That
      The Exculpation Clause In The MRC/Marathon Plan Violates The
      Bankruptcy Code ..............................................................................................34

II.  IF A STAY IS GRANTED, THE INDENTURE TRUSTEE MUST, AMONG OTHER
     THINGS, POST A BOND OF AT LEAST $176 MILLION................................................36

CONCLUSION ...........................................................................................................40

Mendocino Redwood Company, LLC ("MRC"), Marathon Structured Finance Fund L.P. ("Marathon") and the Official Committee of Unsecured Creditors (the "Committee") submit this memorandum of law in opposition to the Emergency Motion For Stay Pending Appeal (the "Motion")[1] filed by The Bank of New York Trust Company, N.A., as Indenture Trustee (the "Indenture Trustee") for the Holders of Timber Notes (the "Noteholders"). As the papers filed by the Indenture Trustee totaled in excess of 40 pages, we respectfully request leave to file this 40 page memorandum.

## PRELIMINARY STATEMENT

What is most striking about the Indenture Trustee's Motion is that it almost completely ignores the fact that the Bankruptcy Court conducted a two-day evidentiary hearing on the Indenture Trustee's request for a stay pending appeal and issued detailed findings of fact and conclusions of law denying the request for a stay because the Indenture Trustee had failed to satisfy **any** of the four elements necessary for a stay. In particular, the Bankruptcy Court found significant and irreparable harm to other parties was likely if a stay pending appeal was imposed, and that the public interest weighs heavily against a stay. Specifically because Debtors are in dire financial condition, they cannot operate in the ordinary course during a stay, and thus delay may result in a liquidation rather than a reorganization. This will cause irreparable harm to the Debtors, creditors, employees, customers, vendors, the environment and the local community. Further, there is substantial risk that a delay will result in MRC and/or Marathon being unable to consummate their plan of reorganization which was confirmed by the Bankruptcy Court. This too would lead to a liquidation of the Debtors. The Bankruptcy Court also issued extensive findings regarding the amount of a bond and other security the Indenture Trustee would have to

---

[1] All terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

provide if a stay pending appeal were to be granted. The Bankruptcy Court's decision cannot be overturned unless it was an abuse of discretion, yet the Indenture Trustee's Motion suggests that this Court is operating on a clean slate.

Curiously, the Indenture Trustee seeks relief from this Court just two days after the Bankruptcy Court granted its request for certification of a direct appeal to the Fifth Circuit Court of Appeals and extended a temporary stay from July 18, 2008 to July 25, 2008 specifically "to allow the Indenture Trustee to seek further relief from the Fifth Circuit Court of Appeals." [Stay Findings at p. 23]. The Indenture Trustee should not be permitted to run parallel tracks seeking the same relief in this Court and the Fifth Circuit, or to delay finalizing the certification process (and thus resolution of the stay issue).

What is also striking about the Indenture Trustee's Motion is that only two pages of it address the most important element that the Indenture Trustee must demonstrate in order to obtain a stay pending appeal: that it will suffer irreparable harm if a stay is not granted. Moreover, the only irreparable harm alleged is that the Indenture Trustee's appeal will become moot absent a stay. But this is true of every appeal of an order confirming a plan of reorganization in bankruptcy and, as a result, courts routinely find that the risk of equitable mootness does not constitute "irreparable harm" and does not justify a stay. The Bankruptcy Court agreed, stating "[i]f the risk of equitable mootness alone were sufficient to constitute irreparable harm, virtually every confirmation order in every bankruptcy case would be subject to a stay pending appeal." [Stay Findings ¶ 17]. The Indenture Trustee's failure to assert true irreparable harm alone compels denial of the Motion.

*****

2

On June 6, 2008, following several months of fiercely contested proceedings [Bankruptcy Case No.07-20027] and a lengthy evidentiary trial regarding the confirmation of five competing Chapter 11 plans of reorganization (the "Confirmation Hearing"), the Bankruptcy Court issued Findings of Fact and Conclusions of Law ("Confirmation Findings", attached as Exhibit A) supporting confirmation of the plan of reorganization (the "MRC/Marathon Plan") proposed by MRC, Marathon and the Official Committee of Unsecured Creditors (the "Committee"). Subsequently, the Bankruptcy Court conducted a trial with respect to the Indenture Trustee's Motion for a Superpriority Administrative Expense Claim (the "507(b) Hearing"). On July 8, 2008, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the MRC/Marathon Plan and denying confirmation of the plan proposed by the Indenture Trustee (the "Indenture Trustee Plan"). That same day, the Bankruptcy Court also denied the Indenture Trustee's motion for a superpriority claim (the "507(b) Order"), having detailed its factual findings on the record the previous day ("507(b) Findings", attached as Exhibit B). On July 9, 2008, the Indenture Trustee filed a Notice of Appeal of the Confirmation Order and the 507(b) Order and an Emergency Motion For Stay Pending Appeal.

On July 10-11, 2008, the Bankruptcy Court conducted an emergency hearing on the Indenture Trustee's Motion for a Stay Pending Appeal (the "Stay Hearing"). The Bankruptcy Court heard extensive evidence on the irreparable harm that the Debtors, MRC, Marathon, creditors, employees, vendors and the public would suffer from imposition of a stay of the Confirmation Order pending appeal and the comparative lack of harm to the Indenture Trustee should its request for a stay be denied. Evidence was also presented regarding the amount of any bond and other security the Indenture Trustee should have to post to protect the various parties in interest should a stay pending appeal be granted.

On July 15, 2008, the Bankruptcy Court issued detailed Findings of Fact and Conclusions of Law regarding the Indenture Trustee's request for a stay pending appeal ("Stay Findings", attached as Exhibit C). The Bankruptcy Court found that the Indenture Trustee had failed to satisfy any of the four elements necessary for a stay pending appeal, and that the balance of the equities militates against a stay. Thus, the motion to say pending appeal was denied. The Bankruptcy Court also explained that if a stay were to be granted, it would be conditioned on the Indenture Trustee providing, among other things, (i) a bond in the amount of $176 million, (ii) $25 million in financing to Debtor Scotia Pacific Company LLC ("Scopac"), (iii) $5 million in subordinated financing to Debtor Pacific Lumber Company LLC and its affiliates ("Palco"); and (iv) discounted logs sold by Scopac to Palco.[2]   Copies of the transcript from the two-day Stay Hearing are annexed hereto as Exhibits D and E, respectively.

## THE MRC/MARATHON PLAN

The MRC/Marathon Plan was accepted by more than 95% of unsecured creditors in number and more than 99% in dollar amount, excluding the Noteholders. The MRC/Marathon Plan was supported by the State of California, Humboldt County, and a litany of political groups and environmental organizations, all of which have a vested interest in the future operations of the Debtors' timberlands. Key elements of the MRC/Marathon Plan include the following:

- The Debtors' commercial timberland and sawmill operations will be integrated into a new entity, presently referred to as Newco.

- MRC and Marathon will contribute a total of $580 million in cash into Newco. $7.5 million of these funds will be used to improve operations at the mill. Marathon will also convert its $160 million of senior secured prepetition and postpetition debt into equity.

---

[2] The Palco Debtors consist of the Pacific Lumber Company, LLC, Scotia Development LLC, Britt Lumber Co., Inc., Salmon Creek LLC and Scotia Inn, Inc. Scopac is wholly owned by the Palco Debtors.

- MRC will manage Newco in a responsible and sustainable manner pursuant to a business plan developed by MRC, assuming all environmental obligations. MRC and its affiliates are experienced and environmentally responsible operators of integrated commercial redwood timberlands, sawmill and lumber distribution operation located in nearly Mendocino County.

- Newco will assume and continue the Debtors' pension plan, allowing current and future retirees to receive full benefits.

- The Noteholders will receive $530 million cash (subject to minor adjustments, but in no event less than $513.6 million), on account of their secured claim and will be eligible for additional distributions from a litigation trust on account of their unsecured deficiency claim. The Noteholders will also retain any lien they have on the Headwaters Litigation which will be placed in a separate trust for their benefit.

- All administrative and priority claims of all Debtors will be paid in full.

- General unsecured creditors will receive $10.6 million in cash, providing them with substantial recoveries (estimated at 75-90%), and will be eligible for further distributions from a litigation trust.

[Confirmation Findings ¶¶ 28-45; 76-91].

## STANDARD OF REVIEW

A stay pending appeal, similar to a preliminary injunction, is an "extraordinary" remedy, which should be "sparingly" granted only in limited circumstances. *See United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981) (a stay pending appeal of a decision granting equitable relief interrupts the ordinary process of judicial review and postpones relief for prevailing party). Bankruptcy Rule 8005 governs a request for a stay pending appeal of an order confirming a plan of reorganization, and the decision whether to grant such a stay is discretionary. *See, e.g., In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007).

The Bankruptcy Court's decision denying a stay pending appeal is reviewed for "an abuse of discretion." *In re Jet 1 Center*, 2006 U.S. District LEXIS 9180, at *4 (N.D. Fla. 2006); *In re Target*, 372 B.R. 866, 870 (E.D. Tn. 2007); *In re Irwin*, 338 B.R. 839, 844 (E.D. Cal.

2006); *Lynch v. Cal. PUC*, 2004 U.S. Dist. LEXIS 6022, at \*5 (N.D. Cal. 2004); *Universal Life Church v. United States*, 191 B.R. 433, 444 (E.D. Cal. 1995); *In re Wymer*, 5 B.R. 802, 807 (9th Cir. 1980). As the Fifth Circuit stated in an analogous context, "[w]e review a district court's orders under [Fed. R. Civ. P.] 62(c) for abuse of discretion." *Sierra Club, Lone Star Chapter v. Ceder Point Oil Co.*, 73 F.3d 546, 579 (5th Cir. 1996) (citations omitted). Moreover,

> [d]iscretion will be found to have been abused when the judicial action is arbitrary, fanciful or unreasonable which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Irwin*, 228 B.R. at 844 (emphasis added) (quoting *In re Blackwell*, 162 B.R. 117, 119 (E.D. Pa 1993)). The abuse of discretion standard is "highly deferential." *Target*, 372 B.R. at 870.

Further, the Bankruptcy Court's Findings of Fact cannot be overturned unless "clearly erroneous." Fed. R. Bankr. P. 8013; *In re Permian Products Drilling, Inc.*, 263 B.R. at 514; *In re Blackwell*, 162 B.R. at 119; *Lynch v. Cal. PUC*, 2004 U.S. Dist. LEXIS 6022 at \*5; *In re First South Savings Ass'n*, 820 F.2d 700, 711 (5th Cir. 1987); *In re Sullivan*, 2006 U.S. Dist. LEXIS 43734, \*5 (E.D. Cal. 2006). A finding is clearly erroneous only if "although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re First South Savings Ass'n*, 820 F.2d at 711 (citation omitted). The Bankruptcy Court's Conclusions of Law are reviewed *de novo*. Fed. R. Bankr. P. 8013; *In re Blackwell*, 162 B.R. at 119 (E.D.Pa 1993); *In re Sullivan*, 2006 U.S. Dist. LEXIS 43734 at \*5; *In re First South Savings Ass'n*, 820 F.2d at 711; *Lynch v. Cal. PUC*, 2004 U.S. Dist. LEXIS 6022 at \*5.

## ARGUMENT

### I.     THE INDENTURE TRUSTEE HAS FAILED TO SATISFY THE NECESSARY CRITERIA FOR A STAY PENDING APPEAL

To obtain a stay pending appeal of the Confirmation Order, the Indenture Trustee must demonstrate **each** of the following:  (1) that the granting of a stay would not substantially harm the other parties in the proceeding; (2) that the granting of a stay would be in the interest of the public; (3) irreparable injury to the Indenture Trustee if the stay is not granted; and (4) a substantial likelihood of success on the merits of its appeal.  *See Arnold v. Garlock Inc.*, 278 F.3d 426, 438 (5th Cir. 2001); *In re First South Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987); *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982); *Smith v. Schmidt*, 2007 U.S. Dist. LEXIS 41901, at *12 (S.D. Tex. June 8, 2007).  Failure of the party seeking the stay to establish **any** of these four elements is grounds to deny the request for stay.  *See Arnold*, 278 F.3d at 438-39; *Smith*, 2007 U.S. Dist. LEXIS 41901, at *12.[3]  The Bankruptcy Court's decision that the Indenture Trustee failed to satisfy **any** of the four elements was correct, was supported by the evidentiary record and the applicable legal authority, and certainly was not an abuse of discretion.

### A.     The Debtors, Their Estates And Creditors Will Suffer Substantial And Irreparable Harm If A Stay Is Imposed

#### 1.     A Lack Of Operating Funds Will Result In Liquidation

If the Confirmation Order is stayed, the Debtors, their estates, MRC, Marathon, and other creditors will all suffer significant and irreparable harm.  The uncontroverted evidence at the Confirmation Hearing and the Stay Hearing clearly demonstrates that the Debtors are in dire financial condition and that any delay in consummating the MRC/Marathon Plan likely will likely result in a liquidation of the Debtors' estate.  Indeed, the Bankruptcy Court found that the

---

[3] In some circumstances the fourth element can be satisfied by showing a substantial case on the merits when a serious legal question is involved and that the balance of the equities is heavily tilted in favor of granting a stay.  *See Ruiz*, 666 F.2d at 857.  As detailed below, that is not the case here.

Debtors have severe liquidity problems, including that Palco in particular has a significant risk of being liquidated if the MRC/Marathon Plan is not consummated promptly, and that operating the mill and the timberlands together – which is not possible if Palco liquidates – is highly beneficial. [Confirmation Findings ¶¶ 227-240]. Moreover, the Bankruptcy Court found that "a stay pending appeal could result in a liquidation of Palco and shutdown of the Scotia Mill and Palco's cogeneration plant . . . because Palco is effectively out of cash, has not been paying its professionals or interest on the Marathon DIP loan and cannot afford to purchase logs necessary to operate." [Stay Findings ¶ 23].

Courts recognize that a stay of a confirmation order which deprives the debtors of the financing that they need to continue operations produces irreparable harm to the debtors, their creditors and other constituencies. *See, e.g., In re TransTexas Gas Corp.*, No. 99-21550-C-11, slip op. at 6-7 (Bankr. S.D. Tex. Feb. 15, 2000) (denying a stay because it would result in lost financing, forcing debtors to cease operations); *Calpine*, 2008 WL 207841, at *5 (granting a stay "would pose very real and significant harm to the Debtors and other stakeholders" because it presents a substantial risk that the Debtors will lose their exit financing and the costs of remaining in Chapter 11, even for three more months, are significant); *In re Convenience USA, Inc.*, 290 B.R. 558, 565-66 (Bankr. M.D.N.C. 2003) (granting a stay would pose a "great risk" to the Debtors because they would be forced to try to operate their business using cash collateral and while incurring the costs of continuing to be in a Chapter 11 case); *In re Horizon Natural Resources Co.*, No. 04-cv-171-HRW, slip op. at 4-6 (Bankr. E.D. Ky. Feb. 25, 2005) (denying a stay of confirmation order because debtors were out of cash and, thus, lacked operating capital to continue their business). As the court stated in *Convenience*, "continuing Chapter 11 operations will be expensive and will drastically change the landscape in this case, making it virtually

impossible for the Plan to be consummated following any appreciable delay" in effectuating the confirmed plan. *Convenience*, 290 B.R. at 565. That is precisely the case here, as Palco does not have the funds to continue operations during the pendency of an appeal.

It is undisputed that the liquidation of Palco (i) will cause the loss of hundreds of jobs, (ii) will eliminate the recovery by Palco's creditors (administrative, priority, secured and unsecured) who are owed millions of dollars and who would receive substantial payments under the MRC/Marathon Plan, (iii) will create significant environmental risks, (iv) will further devalue Marathon's security in Palco's assets and (v) will damage the local economy. [Stay Findings ¶ 23]. Indeed, the entire way of life for the community is at risk if the MRC/Marathon Plan is not promptly consummated. [Id.]

It is also undisputed that Marathon, whose debt is secured by the assets of the Palco Debtors, is undersecured. [MMX 2 ¶ 6][4]; (Tr. 4/8/08 229:14-229:17) Accordingly, Marathon would receive all of the proceeds of a liquidation and Palco's general unsecured creditors – who, under the MRC/Marathon Plan are to receive their pro rata share of $10.1 million in immediate cash, plus litigation trust interests (an estimated recovery of 75%-90%) – would receive nothing. *See In re Dakota Rail, Inc.*, 111 B.R. 818, 822-23 (Bankr. D. Minn. 1990) (holding that in light of the "dire consequences" that creditors who would have been paid if the plan of reorganization were consummated might receive "reduced payments…if they would receive payments at all" if the debtor were forced to liquidate, a stay is not appropriate). Nevertheless, the Indenture Trustee ignores all of this in its Motion, instead limiting its substantial harm inquiry to exclude all parties in interest other than Scopac. Thus, the Indenture Trustee fails to address the fact that

---

[4] "MMX" refers to the MRC/Marathon exhibits entered into evidence during the Confirmation Hearing and the 507(b) Hearing.

a stay pending appeal will cause substantial and irreparable harm to Palco, its creditors, employees, customers, vendors, and the town of Scotia.[5]

The Indenture Trustee also overlooks the substantial harm that Palco's demise will cause Scopac. Palco is the exclusive buyer for Scopac timber. If the mill is forced to close, Scopac will need to find other buyers for its timber. Because Palco currently pays above market prices for timber pursuant to an intercompany agreement and because the other mills in the area have an adequate supply of timber, Scopac's revenue will be adversely impacted. [Stay Findings ¶ 25]. In short, the harm to others from a stay pending appeal is palpable and, therefore, no stay should be granted.

### 2.    The MRC/Marathon Plan Would Collapse

A stay pending appeal will likely lead to the collapse of the MRC/Marathon Plan with no comparable replacement. [Stay Findings ¶ 20]. Courts routinely recognize that stays of confirmation orders would cause serious harm where, as here, the plan is contingent on prompt implementation. *See, e.g., Calpine* 2008 WL 207841 at *5 ("A stay of the Confirmation Order would present a substantial risk that a condition precedent to financing will fail and the Debtors could lose their exit financing, forcing them back into restructuring, looking to obtain new exit financing in an unfavorable capital market environment."); *Adelphia*, 361 B.R. at 354 (in determining whether to grant a stay pending appeal of a confirmation order, court must consider "the risk that the Plan will fall apart"). A plan is likely to fall apart if the debtor will be forced to

---

[5] The Indenture Trustee's assertion that the Court should ignore the substantial harm to Palco and its creditors is nothing short of absurd. The MRC/Marathon Plan is a plan of reorganization for *all* of the Debtors and provides for payment to the creditors of *all* of the Debtors. Consequently, a stay pending appeal of the MRC/Marathon Plan will adversely impact *all* of the creditors, Palco's creditors included. [Stay Findings ¶ 19]. *See, e.g., In re F.G. Metals, Inc.*, 2008 WL 2440708, at *9 (Bankr. M.D. Fla. May 16, 2008) (holding that a delay in the distribution to creditors under a plan of reorganization constitutes substantial harm to other parties); *In re Fairmont Commc'n Corp.*, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) (recognizing "well settled precedent" that "the delay caused to creditors receiving their payments is also a significant harm in warranting denial of a stay"); *In re Great Barrington Fair and Amusement, Inc.*, 53 B.R. 537, 240 (Bankr. D. Mass 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").

discontinue operations. *See Horizon Natural Resources Co.*, slip op. at 6 ("Of the many grave consequences, perhaps the most damaging is that the deal negotiated . . . would likely collapse. The purchase is premised upon ... the sale of a going-concern, not an inactive mining operation."); *Dakota Rail*, 111 B.R. at 822 (recognizing that harm would result from the granting of a stay, such as the depletion of the cash reserve and the possibility that the delay will cause the plan proponents to walk away from the consummation of their plan).

If the MRC/Marathon Plan is stayed pending appeal, there is a substantial risk that MRC and/or Marathon may be unwilling or unable to proceed with the MRC/Marathon Plan at or before the conclusion of any appeal. There is no dispute that if a stay of the Confirmation Order is in effect 60 days following the date of the Confirmation Order, MRC has an absolute right to withdraw the MRC/Marathon Plan. Plan § 11.3. Moreover, MRC and Marathon can jointly withdraw the MRC/Marathon Plan at any time prior to it going effective. Plan § 13.9. The willingness of MRC and Marathon to proceed with the MRC/Marathon Plan could be impacted by the delay inherent in any stay pending appeal. By way of example, interest rates could change, alternative transaction could become available, MRC could decide it is unwilling to continue to reserve more than $200 million of capital for a transaction that is tied up in court for an indeterminate period of time, the economy could further deteriorate, or the fires currently plaguing Northern California could affect the Scopac timberlands or MRC's existing properties. Indeed, the loan commitment obtained by MRC in the amount of $325 million to fund the MC/Marathon Plan is out of MRC's control and could be lost due to the delay. [Stay Findings ¶ 20].

The risk that the MRC/Marathon Plan could collapse if a stay is granted is exacerbated because the $75 million DIP facility Marathon provided to the Palco Debtors matures on August

6, 2008 and there are no funds to repay Marathon. If the MRC/Marathon Plan is not promptly consummated, Marathon would be able to exercise its rights and remedies with respect to the Palco Debtors' assets in order to recover on its unpaid DIP facility. [Stay Findings ¶ 21]. Simply put, if, as is expected, the delay caused by a stay damages the financial condition of Palco and/or Scopac, there is substantial risk that the MRC and/or Marathon will no longer will willing to consummate the transactions, and liquidation will result. [Stay Findings ¶ 22].

Accordingly, if a stay pending appeal is granted, it will ruin any chance that the MRC/Marathon Plan can actually be implemented, regardless of the outcome of the appeal. The probable result of a stay is liquidation, effectively implementing the Indenture Trustee Plan that was rejected by the Bankruptcy Court, rather than the MRC/Marathon Plan, which was confirmed by the Bankruptcy Court. Put another way, the conclusion of the Bankruptcy Court that the MRC/Marathon Plan – and not the Indenture Trustee Plan – should be confirmed will be reversed, not because of the merits of the appeal, but simply because a stay was issued.

### B.    The Public Interest Does Not Favor A Stay

The public interest weighs strongly against a stay pending appeal. First, one of the fundamental purposes of a reorganization is to prevent a debtor from liquidating. *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984). Where the debtor's ability to reorganize is threatened, public policy would not be served by granting a stay. *See, e.g., In re Delaware & Hudson Ry. Co.*, 90 B.R. 90, 91-92 (Bankr. D. Del. 1988) (finding that public harm would result from a stay pending appeal because the stay would foreclose the debtor's ability to reorganize); *Great Barrington*, 53 B.R. at 240-41 ("[I]f a stay is granted, the other interested parties, as well as the public, will suffer harm. The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors."). Granting a stay pending appeal will likely force all of the Debtors into liquidation, thwarting the desire of the overwhelming majority of creditors who

chose a reorganization under the MRC/Marathon Plan and rejected liquidation under the Indenture Trustee Plan. Where there is such potential to circumvent normal judicial proceedings, courts have consistently denied requests for stay pending appeal. *See, e.g., Jimenez v. Barber*, 252 F.2d 550 (9th Cir. 1958) (finding that when the grant of a temporary restraining order pending an appeal will give appellant the fruits of victory, regardless of the outcome of the appeal, that order should not be granted); *Reynolds Metals Co. v. Sec'y of Labor*, 453 F. Supp. 4, 7 (D.C. Va. 1977) (declining an issue of stay pending appeal because doing so would grant plaintiff almost all of the ultimate relief sought in its suit).

Here, granting a stay of the Confirmation Order will significantly jeopardize the Debtors' ability to reorganize, as well as the jobs and pensions of hundreds of employees of the Debtors. Scotia is one of the last remaining live-work communities in California and Palco has historically been one of the largest employers in the region. The closure of the mill and power plant will, therefore, have dire consequences for the local community and economy. Thus, even if the Indenture Trustee is correct that the substantial harm inquiry is limited to Scopac – which it is not – it is clear that the harm that will be suffered by Palco, its creditors, employees, customers, vendors, and the town of Scotia is not in the public interest. The proper running of the town of Scotia, its schools, churches, water facilities, power plant and sewage treatment operations will all be at risk if the MRC/Marathon Plan is not promptly consummated. [Stay Findings ¶ 28].

Second, one of the core features of the MRC/Marathon Plan is that the reorganized Debtors will be run by an experienced and respected timber operator that will assume all of the Debtors' environmental obligations without any modification. Granting a stay and thereby preventing implementation of the MRC/Marathon Plan will seriously hamper the Debtors' ability to comply with their environmental obligations. This is particularly important given the

existence of environmental violations on the Scopac timberlands and the backlog of roadwork that must be completed to comply with existing regulations. [Id.] That is why the State of California, California's wildlife and forestry agencies and the federal wildlife agencies all supported confirmation of the MRC/Marathon Plan and opposed a stay pending appeal. As the Bankruptcy Court found, "[t]he MRC/Marathon Plan has widespread support of the various governmental and regulatory agencies that oversee the Debtors and the Timberlands." [Confirmation Findings ¶ 91]. Thus, the public interest is best served by denying the stay and allowing the MRC/Marathon Plan to be consummated. This will produce a viable, ongoing business that serves as an economic lifeline for this community, preserving jobs, while simultaneously protecting the unique ecosystem of the timberlands. [Stay Findings ¶¶ 29, 30].

### C.    The Indenture Trustee Cannot Demonstrate Irreparable Harm

In contrast to the substantial harm to other parties and the public interest, the Indenture Trustee did not establish that it will suffer irreparable harm if a stay is denied. The Indenture Trustee argues only that it will suffer irreparable harm because if a stay is denied, its appeal will become moot upon consummation of the MRC/Marathon Plan. Although it is true that the appeal may indeed become moot, "a majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury." *Convenience*, 290 B.R. at 563; *see In re Sunflower Racing, Inc.*, 223 B.R. 222, 225 (D. Kan. 1998); *In re BA-MAK Gaming Int'l, Inc.*, 1996 WL 411610, at *2 (E.D. La. July 22, 1996); *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 597-98 (N.D. Ill. 1995); *In re Clark*, 1995 WL 495951, at *6 (N.D. Ill. Aug. 17, 1995); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992); *In re Kent*, 145 B.R. 843, 844 (Bankr. E.D. Va. 1991); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987); *Great Barrington, Inc.*, 53 B.R. at 240; *In re Baldwin United Corp.*, 45 B.R. 385, 386-87 (Bankr. S.D. Ohio 1984); *Dakota Rail*, 111 B.R. at 821. The

Bankruptcy Court adopted the majority view, stating, "[i]f the risk of equitable mootness alone were sufficient to constitute irreparable harm, virtually every confirmation order in every bankruptcy case would be subject to a stay pending appeal." [Stay Findings ¶ 17].

Moreover, at most, the Indenture Trustee can assert that the amount of its recovery would be higher if the Confirmation Order was reversed on appeal and the Indenture Trustee Plan was confirmed. This potential economic harm, however, is highly speculative at best. [Stay Findings ¶ 18]. Thus, if the Motion for a stay is denied, the MRC/Marathon Plan will become effective and the Noteholders will receive the cash distribution contemplated under the MRC/Marathon Plan -- $530 million (subject to adjustment), but in no event less than $513.6 million. By contrast, under the Indenture Trustee Plan, any recovery by the Noteholders is at least eight months away due to the need for a lengthy sales process and there is no certainty the amount received will exceed $513.6 million. To the contrary, the Bankruptcy Court found that "the Noteholders will receive more under the MRC/Marathon Plan than a sale pursuant to the Beal Term Sheet under the Indenture Trustee Plan." [Confirmation Findings ¶ 287]. Indeed, the Bankruptcy Court found that the Indenture Trustee Plan was not even feasible and that the Beal Term Sheet purporting to offer $603 million for the timberlands "appears to be a straw man for a foreclosure sale and not a serious bid to reorganize the Debtors or even Scopac." [*See id.* p. 4]. The Bankruptcy Court found that if the Indenture Trustee is successful on appeal, there is substantial evidence that the value the Noteholders would receive in a sale of the timberlands is "far below" what they will receive under the MRC/Marathon Plan. [Stay Findings ¶ 27]. This was in part because despite extensive marketing both before and during this bankruptcy case, neither Scopac nor the Indenture Trustee had been able locate anyone who was willing to make a

firm, unconditional offer for the timberlands, let alone one that will result in a recovery to the Noteholders in excess of $513.6 million.  [Confirmation Findings ¶¶ 249-53].

### D.    Balancing the Equities

In balancing the potential harm to the Noteholders against the potential harm to others, the Bankruptcy Court found that the balance militates against a stay pending appeal.  [Stay Findings ¶¶ 27, 32].  This determination obviously was proper given the speculative nature of any harm to the Noteholders compared to the clear and irreparable harm to others if a stay pending appeal is imposed.  Accordingly, the Bankruptcy Court did not abuse its discretion in denying a stay pending appeal.

### E.    The Indenture Trustee Cannot  Demonstrate A Substantial Likelihood That Its Appeal Will Succeed On The Merits

In denying a stay pending appeal, one court recently explained that "when the issue appealed is mostly a factual question over which the bankruptcy court has broad discretion, such discretion is unlikely to be overturned on appeal...Thus with respect to questions of fact, the movant usually fails to satisfy the element required for a stay pending appeal  -- a likelihood of success on the merits." *Smith*, 2007 U.S. Dist. LEXIS 41901, at *16 (citation omitted); *see In re Burkett*, 279 B.R. 816, 817 (Bankr. W.D. Tex. 2002) (movant unable to demonstrate likelihood of success on appeal necessary for a stay because "this court's findings of fact, based primarily on  an evaluation of the credibility and demeanor of witnesses, are highly unlikely to be reversed on appeal as 'clearly erroneous'").

The key issue during the Confirmation Hearing was the value of the timberlands.  The Bankruptcy Court heard extensive testimony from a multitude of experts and reviewed thousands of pages of expert reports and exhibits.  At the end of that adversarial process, the Bankruptcy Court made credibility determinations that the testimony of MRC and Marathon's experts was

entitled to substantial weight while the testimony of the Indenture Trustee and Scopac's experts was entitled to little weight. [Confirmation Findings ¶¶ 134, 164, 186, 218]. Nonetheless, the Bankruptcy Court did not simply adopt the opinions of the MRC and Marathon experts, but rather made an informed factual finding that the value of the timberlands is not more than $510 million. [*See id.* p. 61]. The Indenture Trustee cannot show that this key factual finding was clearly erroneous and likely to be overturned on appeal.

Apparently recognizing this, the Indenture Trustee tries to turn valuation (and numerous other factual findings) into "legal issues." However, the Bankruptcy Court carefully considered and rejected *every single one* of the Indenture Trustee's arguments after hearing evidence at the Confirmation Hearing and receiving lengthy pre and post-hearing briefs from the parties. [Stay Findings ¶ 13]. The Bankruptcy Court recognized the Indenture Trustee's improper attempt to cast factual findings as legal issues stating that:

> the Court lifted exclusivity, giving the Indenture Trustee the same opportunity as Marathon to propose a plan of reorganization. The Indenture Trustee knew from the mediations that Marathon was proposing a comprehensive plan to reorganize all the debtors and that there was overwhelming support for such a plan. Nevertheless the Indenture Trustee chose not to propose its own such comprehensive plan. The Indenture Trustee was in a far better position (perhaps as much as 20:1) to pay the value of Marathon's secured claim than Marathon was to pay the value of the Indenture Trustee's secured claim. The Indenture Trustee's real complaint concerns the value placed on the timberlands by the Court – a fact question.

[Stay Findings ¶ 13].

1.      **The Indenture Trustee Is Not Likely To Succeed In
        Demonstrating That The MRC/Marathon Plan Could
        Not Be Crammed Down Over Its Objection**

        (a)     **The Indenture Trustee Cannot Demonstrate That The
                MRC/Marathon Plan Does Not Provide The Noteholders
                With The Indubitable Equivalent Of Their Secured Claim**

Under section 1129(b)(2)(A) of the Bankruptcy Code, a plan will be deemed fair and

equitable and, thus, may properly be confirmed over the objection of a class of secured creditors

(i.e. "cramdown"), if it provides "for the realization by such holders of the indubitable equivalent

of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii). The plan proponent need only show by a

preponderance of the evidence that under the plan, the secured class will realize the indubitable

equivalent of its secured claims. In order to provide indubitable equivalence under section

1129(b)(2)(A)(iii), a plan must provide a secured creditor with the value of its secured claim.

*See Sandy Ridge Dev. Corp. v. Louisiana National Bank (In re Sandy Ridge Dev. Corp.)*, 881

F.2d 1346, 1350 (5th Cir. 1989) ("[S]ection 1129(b)(2)(A)(iii) can be accurately read to state

'the realization of the holders of secured claims of the indubitable equivalent of their *secured*

claims.'") (emphasis in original).

In conducting an inquiry into indubitable equivalence, a court must examine (i) whether

the treatment that an impaired, non-consenting secured creditor receives under the plan is

"completely compensatory," and (ii) the likelihood that the secured creditor will receive

payment. *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 529 (S.D. Tex. 1990). It is axiomatic

that cash in an amount equal to the value of the secured creditors' collateral is completely

compensatory and constitutes the indubitable equivalent. *See, e.g., In re Wiersma*, 324 B.R. 92,

112 (9th Cir. B.A.P. 2004), *rev'd. on other grounds*, 483 F.3d 933 (9th Cir. 2007) (recognizing

that with respect to indubitable equivalence, "cash is king."); *In re San Felipe @ Voss, Ltd.*, 115

B.R. at 530 (noting that section 1129(b)(2)(A)(iii) does not contain a requirement of strict cash

equivalence, thereby implying that strict cash equivalence would satisfy that section); *In re Keller*, 157 B.R. 680, 684 (Bankr. E.D. Wash. 1993)(annuity contract, which is a cash equivalent, was indubitable equivalent of partial release of secured creditor's line on real estate).

The Noteholders concede that they are undersecured because the amount of their claim exceeds the value of their collateral. The Bankruptcy Code provides a mechanism for courts to bifurcate an undersecured creditor's claim into allowed secured and unsecured claims by making a determination as to the value of the creditor's security interest. Pursuant to section 506(a)(1) of the Bankruptcy Code, "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property..." 11 U.S.C. § 506(a)(1). Thus, the Bankruptcy Code makes clear that undersecured creditors are entitled only to payment in full of the value of their secured claims and an unsecured deficiency claim for the rest.[6] *See Lakeside Global II*, 116 B.R. 499, 513 (S.D. Tex. 1989) ("The lienholder is entitled to the allowed amount of its secured claim to the extent the claim is secured by collateral.").

The court can determine the value based on expert opinion and other evidence presented at the Confirmation Hearing. *See In re Calpine Corp.*, 2007 Bankr. LEXIS 3420, at *4 (Bankr. S.D.N.Y. Oct. 4, 2007)*; In re Nellson Nutraceutical, Inc.*, 2007 Bankr. LEXIS 99, at *62 (Bankr. D. Del. Jan. 18, 2007). In assigning value, the court has discretion to reject or "adopt an expert's opinion or be able to adjust the number generated by the expert to account for changes in assumptions considered necessary by the court," including making corrections for events occurring after the expert opinions were rendered. *In re Mirant Corp.*, 334 B.R. 800, 824

---

[6] Under the MRC/Marathon Plan, Class 6 represents the Noteholders' secured claim and Class 9 represents their unsecured deficiency claim.

(Bankr. N.D. Tex. 2005); *see Nellson*, 2007 Bankr. LEXIS 99, at *63-65; *River Valley Fitness One Ltd. P'ship*, 2006 Bankr. LEXIS 345, at *24 (Bankr. D.N.H. Mar. 7, 2006).

At the Confirmation Hearing, the Bankruptcy Court heard extensive testimony from a multitude of experts and reviewed thousands of pages of expert reports and exhibits regarding the value of the timberlands.  MRC and Marathon presented evidence that the value of the timberlands is approximately $430 million.  The Indenture Trustee asserted that the value was approximately $605 million.  At the end of that process, the Bankruptcy Court made credibility determinations that the opinions of the MRC and Marathon experts were entitled to "great weight," while the contrary evidence was afforded "little weight." [Confirmation Findings ¶¶ 134, 164, 186, 218].  The Bankruptcy Court ultimately found that the value of the timberlands is "not more than $510 million."  [*See id.* pp 9, 61].  Accordingly, the MRC/Marathon Plan complies with Section 1129(b)(2)(A)(iii) because it provides that on the effective date the Noteholders will receive cash in an amount not less than $513.6 million.  Thus, the indubitable equipment test is satisfied – the cash payment on the effective date is completely compensatory and there is no risk of non-payment.[7]

The Indenture Trustee asserts without basis that the MRC/Marathon Plan uses value from Scopac's bankruptcy estate to satisfy Palco's creditors.  The Indenture Trustee has cherry-picked sound bites from the Bankruptcy Court's ruling denying its superpriority claim and placed them out of context in an apparent attempt to mislead this Court into believing that the Bankruptcy Court agreed that Marathon or MRC sought to "steal" value from Scopac.  In fact, the opposite is true, as the Bankruptcy Court's decision, read in context, reveals.

---

[7]   Any minor difference between the total collateral value and the value of the timberlands is more than satisfied payment of $513.6 million which exceeds the value of the timberlands.  Further, the Noteholders also retain their lien in the Headwaters Litigation.

The Indenture Trustee relies on an email written by Mr. Dean during the exclusivity period of the Bankruptcy, before any of the mediations had taken place, and while Marathon was courting MRC as a potential plan proponent. The Bankruptcy Court offered a warning about this email: "In that e-mail, Mr. Dean described a number of things which, taken out of context, certainly can sound as affronts to the integrity of some jurisdiction systems. **However, they have to be kept in mind in the context of this case.**" [507(b) Findings 12:5-8 (emphasis added)].

It is clear that the Indenture Trustee chose to disregard this instruction and, instead, provides this Court with a series of half-truths. The Bankruptcy Court **did not** simply "observe[]" that:

> Then there was the comment about a bogus appraisal. You know, we talked about MAI appraisers in this particular case, and the Court is mindful of the old joke that MAI stands for "made as instructed." Well, you know, businessmen have different impressions about the impact of appraisals in cases. The statement was made that "the debtor or Marathon might use a bogus appraisal to cram down the note holders."

In the very next sentence, the Bankruptcy Court went on to explain why it was unconcerned about this comment:

> Well, that's exactly the concern the Supreme Court had in the LaSalle case, and to avoid that possibility, the Court lifted exclusivity. So, the Court is certainly mindful of the fact that while there's exclusivity, a debtor might try to use appraisals to cram down note holders, and it would be inappropriate under LaSalle, but putting it out into the market by lifting exclusivity does, in fact, provide a mechanism for everyone to be able to avoid the possibility that someone might use a so-called bogus appraisal to cram down someone in a bankruptcy case.

[507(b) Findings 13:6-13:16].

Likewise, with respect to the allegation that Marathon was "stealing equity" the Bankruptcy Court found that not only did Marathon have no equity, but also that the

"IT had no equity; that's the certainly the finding that [the Bankruptcy Court has] made, and I think that's the position they took early on in the case and throughout the case." [507(b) Findings 13:25-14:2]. Further, when exclusivity is lifted, it is "then everybody's chance to put forth a plan that might give them the best possible situation." As the Bankruptcy Court pointed out Indenture Trustee "had perhaps a 20-to-1 leverage advantage over Marathon to propose a buyout of all the assets" and could have crammed down Marathon. [507(b) Findings 14:18-15:6].

         As the Bankruptcy Court explained:

> The MRC/Marathon Plan honors both the letter and spirit of the Bankruptcy Code by paying exactly what the Bankruptcy Code requires: cash equal to the value of the allowed secured claim on the effective date. There is little doubt that this has been allowed in reorganization cases for decades. In this case, the Noteholders will receive the value of their collateral in cash on the Effective Date – exactly what they are supposed to receive for a secured claim. This treatment is not extraordinary and fully complies with the Bankruptcy Code.

[Stay Findings ¶ 14].

### (b)   The Indenture Trustee Cannot Demonstrate That The Noteholders Have the Right to Credit Bid

         The Indenture Trustee asserts that the MRC/Marathon Plan amounts to a sale of assets free and clear of their liens. Thus, it argues, the MRC/Marathon Plan can only be confirmed over the objection of Class 6 under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, and the Noteholders must be afforded the right to credit bid under section 363(k) of the Bankruptcy Code. This argument is flawed for several reasons.

         First, section 1129(b)(2)(A) is written in the disjunctive and, therefore, provides for three distinct alternatives, only **one** of which must be satisfied for confirmation of a plan over the

objection of a dissenting class.[8]  *See In re Briscoe Enters*, 994 F.2d at 1168 (observing that the "or" in 1129(b)(2)(A) is not an "and" and affirming confirmation of a plan that satisfied only 1129(b)(2)(A)(i)); *In re Criimi Mae, Inc.*, 251 B.R. 796, 806 (Bankr. D. Md. 2000) ("By using the word 'or,' Congress plainly drafted section 1129(b)(2)(A) so that compliance with any of the enumerated subsections, (i), (ii), or (iii), would result in a finding that a plan of reorganization was fair and equitable as to the treatment of an objecting class of secured claims."); *In re Broad Assocs. LP*, 125 B.R. 707, 711 (Bankr. D. Conn. 1991) (noting that on its face section 1129(b)(2)(A) is disjunctive and, therefore, if one of the options is satisfied, the inability to meet the requirements of another would not prevent confirmation).    As detailed above, the MRC/Marathon Plan satisfies the indubitable equivalent standard of section 1129(b)(2)(A)(iii) and, thus, is confirmable.  The Court's inquiry need not go further and Section 1129(b)(2)(A)(ii) is wholly irrelevant.[9]  *See Criimi Mae*, 251 B.R. at 807 (because the language of section 1129(b)(2)(A) is written in the disjunctive, the plan could be confirmed without compliance with section 1129(b)(2)(A)(ii) if the plan proponents could satisfy the test for indubitable equivalence); *Broad Assocs.*, 125 B.R. 707 ("There is no express code requirement that a sale proposed by a chapter 11 plan must give secured creditors the right to make a credit bid.").

---

[8]  The Indenture Trustee concedes this point in its Pre-Confirmation Hearing Brief when it states that "Fulfillment of any one of the subparts (i), (ii), or (iii) will satisfy the 'fair and equitable' requirement."  (IT Pre-Hearing  Br. At 11 n.10) (citing *Arnold & Baker Farms v. United States ex rel. Farmers Home Admin (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1420 (9th Cir. 1996); *Wade v. Bradford*, 39 F.3d 1126 (10th Cir. 1994)).  The Indenture Trustee, and the Noteholders it represents, cannot now be heard to argue otherwise.  *See Khan v. Hakim*, 201 Fed. Appx. 981, 984 (5th Cir. 2006) (application of judicial estoppel is warranted when (1) the party's position is clearly inconsistent with his earlier position; and (2) the party has convinced a court to adopt the position urged, either preliminarily or as part of a final disposition.).  The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Id.*

[9]  For this reason, the Indenture Trustee's argument that the Bankruptcy Court erred in confirming the MRC/Marathon Plan when it does not provide for the Indenture Trustee to retains all of its liens pursuant to Section 1129(b)(2)(A)(i) is also without merit.  The MRC/Marathon Plan need not satisfy section 1129(b)(2)(A)(i) or (ii) because it satisfies subsection (iii) and is, therefore, confirmable.

A second flaw in the Indenture Trustee's argument for a right to credit bid is that the MRC/Marathon Plan does not contemplate a "sale" of the collateral. Rather, the assets of the Debtors will be **transferred** to the newly formed entities as part of a reorganization of the Debtors' business pursuant to section 1123(a)(5)(B) of the Bankruptcy Code. Numerous sections of the Bankruptcy Code distinguish between a "sale" and a "transfer" of assets. *Compare* 11 U.S.C. § 1123(a)(5)(B) ("transfer") with § 1123(a)(5)(D) ("sale"); § 1129(b)(2)(A)(i)(I) ("transfer") with 1129(b)(2)(A)(ii) ("sale"); *see also* 11 U.S.C. § 363(b) ("sale"). The Bankruptcy Code defines "transfer" to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). The term "sale" is not defined in the Bankruptcy Code. However, the elements of a sale are (i) parties standing to each other in the relation of buyer and seller; (ii) their minds assenting to the same proposition; and (ii) passing of consideration. *See Comm'r of Internal Revenue v. Freihofer*, 102 F.2d 787, 790 (3d Cir. 1939).

The transfer of assets pursuant to the MRC/Marathon Plan is not a "sale" because there is no mutual assent between the party that owns the assets (the Debtors' estates) and the parties to whom the assets will be transferred (Newco and Townco). Rather, reorganization under the MRC/Marathon Plan contemplates a court-ordered transfer of assets to new entities not as a voluntary measure on the part of the Debtors, but as the preference of creditors who have voted on the several plans proposed in these cases. The MRC/Marathon Plane expressly provides that the Debtors shall **transfer** all Assets of the Estates and Interests in the Estates, to the fullest extent of sections 541 and **1123(a)(5)(B)** of the Bankruptcy Code.[10] The Bankruptcy Court

---

[10] The Indenture Trustee's assertion that the transfer of assets under the MRC/Marathon Plan constitutes a sale is based on its misunderstanding of (1) the testimony of Matthew Breckenridge and (2) the fact that the MRC/Marathon Plan was amended mid-Confirmation Hearing to provide Class 6 with cash payments and to increase the amount that Class 6 will receive under the Plan by $30 million. Not being a lawyer, and certainly not a

specifically found that the "MRC/Marathon Plan constitutes a transfer of assets under Section 1123(a)(5)(B) of the Bankruptcy Code and thus any right to credit bid in a sale is not implicated." [Confirmation Findings at p. 114].

Third, there is no general right to credit bid in a sale pursuant to a plan of reorganization as distinct from a sale outside of a plan pursuant to section 363(b).[11] *See In re Orfa Corp. of Philadelphia*, 1991 WL 225985 at *5 (Bankr. E.D. Pa. Oct. 30, 1991) ("[T]here is no code provision which expressly renders a sale conducted pursuant to a plan of reorganization subject to §§ 363(b), (k)."). Rather, the Bankruptcy Code provides another form of protection from the risk that a secured creditors' claim will be judicially undervalued and cashed out at such a value pursuant to a plan of reorganization. This protection is the election under section 1111(b)(2) of the Bankruptcy Code. *See id.* (noting that because secured creditor had the right to elect under section 1111(b) none of the "evils" which lead to the application of section 363(k) to a sale within a Chapter 11 plan were present). As one Court explained, a plan that denies a secured creditor the right to credit bid and to elect under 1111(b) may not be fair and equitable, but if the secured creditor had the opportunity to make such an election, the plan is fair and equitable regardless of the denial of the secured creditor's right to credit bid. *See Broad Assocs.*, 125 B.R. at 712. Therefore, the secured creditor's right to receive the full value of its collateral is

---

bankruptcy lawyer, Mr. Breckenridge used terms like "sale," "purchase" and "foreclosure" in his testimony the way a layman would use them. It is the operative structure under the MRC/Marathon Plan that is controlling, however. Furthermore, the MRC/Marathon Plan was amended solely for the purpose of ensuring that Class 6 will receive the indubitable equivalent of its secured claims.

[11] In addition, because the Court may deny the right to credit bid under section 363(k) "for cause," there is no absolute right to credit bid. *See In re NJ Affordable Homes Corporation*, 2006 WL 2128624, *16 (Bankr. D.N.J. June 29, 2006) (discussing denial of right to credit bid for cause); *In re Takeout Taxi Holdings, Inc.*, 307 B.R. 525, 536 (Bankr. E.D. Va. 2004) (recognizing credit bid may be denied for cause); *In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) (noting that "there is no absolute entitlement to credit bid" because a credit bid can be denied for cause and denying right to credit bid because price was clearly inadequate); *In re Diebart Bancroft*, 1993 WL 21423 (E.D. La. Jan. 26, 1993) (district court upheld bankruptcy court decision to deny credit bid for cause because cash needed to resolve lien dispute).

protected if it has **either** the right to credit bid under section 363(k) **or** the right to elect fully-secured status under section 1111(b).

There is no dispute that the MRC/Marathon Plan expressly provided the opportunity for the Noteholders to make an election pursuant to section 1111(b) of the Bankruptcy Code and that the Noteholders failed to take any action to invoke their rights under that provision by the applicable deadline. As the Bankruptcy Court explained, "[t]he Indenture Trustee could have tried to obtain more than the cash amount of its secured claim by making an election under Section 1111(b) of the Bankruptcy Code. It made the tactical and strategic decision against that option and, in doing so, surely understood that it would receive a cash payment equal to the present value of its secured claim. [Stay Finding ¶ 13].[12]

> ## 2. The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Failed To Comply With The Absolute Priority Rule

The absolute priority rule requires that "a plan of reorganization may not allocate any property whatsoever to any junior class on account of their interests or claims in a debtor unless all senior classes consent, or **unless such senior classes receive property equal in value to the full amount of their allowed claims...**" COLLIER ON BANKRUPTCY, ¶1129.04[4][a] (emphasis added) (paraphrasing 11 U.S.C. §1129(b)(2)(B)(ii) and 11 USC §1129(b)(2)(C)(ii)). The

---

[12] The Indenture Trustee's assertion of a right to credit bid is based on its theory that an auction must be performed pursuant to the Indenture Trustee Plan to test the market for the Debtors' business. The Bankruptcy Code and applicable case law do not require any such auction, as reliance on expert valuation testimony is common. *See Protective Committee for Independent Stockholders of TMO Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 444-53 (1968). Moreover, the Debtors' assets have been amply exposed to the market in at least three ways. First, the Debtors' assets were thoroughly marketed prior to their bankruptcy filing. [Confirmation Findings, ¶¶ 249-53]. Second, through the Bankruptcy Court's termination of the Debtors' exclusive right to propose a plan of reorganization, a sufficient market test has already taken place. *See Bank of America Nat'l Trust and Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) [Stay Findings ¶ 13]. Third, the record reflects the presence of other bidders throughout the plan process and that the Indenture Trustee sought other bidders, but none have presented a binding offer for more value than provided through the MRC/Marathon Plan. [Confirmation Findings ¶¶ 259-77]. Given the extensive marketing efforts discussed above, the Bankruptcy Court found no need to subject the Timberlands to any additional market test. [Confirmation Findings at p. 114-15].

Indenture Trustee contends that the MRC/Marathon Plan violates the "absolute priority rule" by (1) providing payment to Scopac's unsecured creditors without paying the Indenture Trustee's claims in full and (2) "diverting" the assets of Scopac to provide payments to the unsecured creditors of both Scopac and Palco. Not only is this claim based on flawed reasoning, but it also selectively ignores the facts of this case.

While the Indenture Trustee tries to dress this up as a legal issue, it boils down to the same thing – the value of the Noteholders' secured claim. Here, the secured claim **is** being paid in full. The Indenture Trustee is being paid $530 million in cash (less a Class 6 adjustment), but in no event is the Indenture Trustee receiving less than $513.6 million under the MRC/Marathon Plan, in accordance with the Bankruptcy Court's finding regarding the value of the Indenture Trustee's secured claim. Therefore, as a matter of fact, as found by the Bankruptcy Court, the Indenture Trustee is receiving the full value of its collateral, in cash, on the effective date. [13]

Second, the Indenture Trustee's claim that the unsecured creditors are somehow being paid out of its collateral does not make sense and is not factually accurate. The Indenture Trustee posits that since Marathon is being paid the full value of Palco's assets, any payments made to the unsecured creditors under the MRC/Marathon Plan must be coming out of Scopac's assets, to which the Indenture Trustee is entitled, thus violating the absolute priority rule. Again, this is a value issue – once the Indenture Trustee receives the full value of its collateral, there can be no "diversion" of its collateral to others.

In fact, the payments made to the unsecured creditors of Scopac and Palco under the MRC/Marathon Plan actually come from the $580 million contributed by both MRC and Marathon and the conversion of Marathon's $160 million of senior secured pre-petition and post-

---

[13] The Indenture Trustee also retains its lien on the Headwaters Litigation on account of its secured claim.

petition debt into equity.  Therefore, the Indenture Trustee's argument that the MRC/Marathon Plan violates the absolute priority rule is without merit.  As the Bankruptcy Court concisely stated, "[t]he Indenture Trustee's real complaint concerns the value placed on the timberlands by the Court – a fact question."  [Stay Findings ¶ 13].

### 3.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Improperly Substantively Consolidated The Debtors

The Indenture Trustee asserts that the MRC/Marathon Plan improperly provides for a substantive consolidation of Palco and Scopac.[14]  The short answer is that the MRC/Marathon Plan does **not** substantively consolidate Palco and Scopac.  The MRC/Marathon Plan separately classifies the claims of creditors of Palco and Scopac.  The Debtors' assets are not pooled to pay creditors, but rather payment comes primarily from the $580 million invested by MRC and Marathon.  In fact the structure of the MRC/Marathon Plan provides that *post-Effective Date* there will be a transfer and merger of assets as expressly contemplated by section 1123(a)(5)(B) of the Bankruptcy Code.  [Confirmation Findings at p. 88].  As the Noteholders are receiving cash in full satisfaction of their secured claim (plus any lien on the Headwaters Litigation and potential recoveries from a separate Scopac Litigation Trust), the manner in which the assets of Newco and Townco are structured post-confirmation is of no relevance to them.  As the Bankruptcy Court found, "[t]he MRC/Marathon Plan honors both the letter and spirit of the Bankruptcy Code by paying exactly what the Bankruptcy Code requires: cash equal to the value of the allowed secured claim on the effective date."  [Stay Findings ¶ 14].  Not one penny of Scopac's assets is being used to pay Palco's creditors.  In fact, Palco's secured creditor,

---

[14]  There is no dispute that the substantive consolidation of the Palco Debtors is appropriate.

Marathon, isn't being paid out of Scopac's assets at all, but instead, is converting its $160 million of debt into equity and infusing additional capital.[15]

### 4.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Fails To Pay Intercompany Administrative Claims

The MRC/Marathon Plan requires that **all** Allowed Administrative Expense Claims and Priority Claims be paid in accordance with section 1129(a)(9) of the Bankruptcy Code. The MRC/Marathon Plan thus satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code. Indeed, the language of the MRC/Marathon Plan was specifically amended at the request of the Indenture Trustee to remove any ambiguity on this point. Scopac's administrative claims against Palco, if any, are paid to the Indenture Trustee as part of the distribution on its secured claim in accordance with the Class 6 Adjustment in the MRC/Marathon Plan.

### 5.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Fails To Provide The Indenture Trustee With At Least As Much As It Would Receive In a Chapter 7 Liquidation

Section 1129(a)(7) of the Bankruptcy Code codifies what is generally referred to as the "best interests of creditors test" and focuses on individual dissenting parties rather than classes. *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship (In re 203 North LaSalle St. P'ship)*, 526 U.S. 434, 441-n.13 (1999). In order for a plan to be in the best interests of creditors under section 1129(a)(7) of the Bankruptcy Code, the court must find that each dissenting creditor or equity security holder will receive or retain value under the plan that is not less than the amount such holder would receive if the debtor was liquidated. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992).

---

[15] The American Securitization Forum seeks to file an amicus brief asserting that the alleged substantive consolidation in the MRC/Marathon Plan would impact the securitization market. However, the Bankruptcy Court expressly found that "[n]o evidence was presented that denial of a stay pending appeal would impact the securitization market." [Stay Findings ¶ 26].

The only creditors rejecting the MRC/Marathon Plan are, effectively, the Noteholders –
their secured claims (Class 6) and their unsecured deficiency claims (Class 9). Under the
MRC/Marathon Plan, the Noteholders will receive a minimum of $513.6 million in cash on
account of their secured claim. This is higher than the fair market value of the timberlands and
its liquidation value. Indeed, relying on the extensive expert testimony of Mr. LaMont and Mr.
Johnston during the Confirmation Hearing, as well as the Debtors' liquidation analysis in the
Joint Disclosure Statement, the Bankruptcy Court found, as on a factual matter, that the
Noteholders would receive less in a Chapter 7 than under the MRC/Marathon Plan.
[Confirmation Findings at pp. 105-06]. The Bankruptcy Court reiterated this finding following
the Stay Hearing stating "there is substantial evidence to suggest that the foreclosure value is far
below the amount [the Noteholders] will receive under the MRC/Marathon Plan." [Stay
Findings ¶ 27].

Specifically, the uncontroverted testimony of Mr. Johnston at the Confirmation Hearing
was that in a Chapter 7 liquidation, the Debtors' assets are likely to sell for less than 50% of
their value, and that the Noteholders will receive substantially less in a Chapter 7 liquidation than
under the MRC/Marathon Plan. [Confirmation Finding, ¶¶ 289-93]. As Mr. Johnston explained,
this would be true even in the unlikely event that Scotia Redwood Foundation, *i.e.*, Mr. Beal,
purchased the timberlands in Chapter 7 liquidation for the amount set forth in the Beal term
sheet.[16] Mr. Johnston testified that, if the Timberlands are sold in a Chapter 7 liquidation, Beal
likely would not pay $603 million, but rather there would be a significant reduction due to the
fire sale nature of a Chapter 7 liquidation. [*Id.*]. Even if the transaction described in the Beal
term sheet were to close in a Chapter 7 liquidation, the Noteholders would receive a lower

---

[16] As noted above, the Bankruptcy Court found that the "Beal bid" was not a real offer.

distribution due to costs, expenses, other claims, etc.   After taking into account the non-regulatory risks of the transaction not closing, the present value of the payment to the Noteholders would be $505.2 million, less than what they receive under the MRC/Marathon Plan.  [Confirmation Findings ¶¶ 278-287].   Thus, the evidence clearly demonstrated, and the Bankruptcy Court found, that the amount of the distribution to the Noteholders on account of their secured claim under a liquidation scenario would be less than the amounts realized under the MRC/Marathon Plan.[17]

**6.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Improperly Classifies Unsecured Claims**

The Fifth Circuit, in interpreting section 1122 of the Bankruptcy Code, has found that separate classification of similar claims is permitted if there are "good business reasons" for such classification.  *In re Briscoe Enters.*, 994 F.2d at 1167 (noting that *Greystone* decision did not prohibit separate classification); *see also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (declining separate classification of claims, but recognizing that good business reasons may exist to separately classify similar claims); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (separate classification of unsecured creditor was justified because creditor was integral to business of the reorganized debtor).   Good business reasons exist to separately classify creditors that have a "different stake in the future viability of the reorganized company;" *In re Briscoe Enters.*, 994 F.2d at 1167; or that have disparate legal rights against the debtors.  *See, e.g., In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1321 (7th Cir. 1995).

---

[17] As the Noteholders concede, they are undersecured and, thus, in a Chapter 7, they would receive no recovery on account of their deficiency claim.  Under the MRC/Marathon Plan, however, Class 9 has a right to recover from proceeds of the Litigation Trust.

31

Mr. Dean testified regarding several key facts that justify separate classification of Classes 8 and 9. The Holders of Scopac Trade Claims (Class 8) "are small, local creditors in a close knit and insulated timber community." [MMX 1 ¶ 103]. These creditors "will look to continuing operations as a source of their own future business." *Id.* As a result of the limited universe of businesses in the small, insulated community, the "goodwill of these trade creditors is important for the future operations of the business," and "if the Scopac Trade Claims do not receive a substantial cash recovery, Scopac's operations would suffer, thereby reducing the value of the Debtors' assets." *Id.* The desire of MRC and Marathon to allow the new company to "(a) continue to have the benefit of services provided by existing vendors and to seamlessly continue operations; (b) draw on the body of institutional knowledge held by Scopac's various vendors, employees and contractors; (c) have the confidence of the community and thus attract capable new vendors, employees and contractors; and (d) create positive employee and community morale for the newly reorganized operation." (*id.* ¶ 104). Thus, the Class 8 creditors' have a stake in the future viability of redwood operations in the local area, which is the future viability of their own businesses. In contrast, the creditors in Class 9 (primarily the Noteholders' unsecured deficiency claims) "are for the most part only seeking to recover on account of their claim with no hope or desire to provide ongoing goods or services to the business." *Id.* Based on this unrefuted testimony the Bankruptcy Court found a factual basis to separately classify classes 8 and 9, and that the classification was not designed to gerrymander an affirmative vote on the MRC/Marathon Plan. [Confirmation Findings ¶¶ 241-44, p. 92-93].

Even if the Court were to conclude that the separate classification of Classes 8 and 9 was improper, confirmation of the MRC/Marathon Plan was still appropriate. In addition to Classes 5 and 8, Classes 3 (DIP Loan Claim), 4 (Term Loan Claim), Class 5 (Scopac Loan Claim) and 7

(Palco Unsecured Claims) voted to accept the MRC/Marathon Plan. Thus, an impaired consenting class still exists as required by section 1129(a)(10) of the Bankruptcy Code. *See Beal Bank S.S.B. v. Waters Edge Ltd. P'ship.*, 248 B.R. 668, 690-91 (D. Mass. 2000).[18] This further demonstrates the lack of any intent to gerrymander an impaired consenting class – the only reason to reject a proposed classification scheme. *See Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("Thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

> **7.    The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The MRC/Marathon Plan Discriminates Unfairly Against Class 9**

The MRC/Marathon Plan does not discriminate unfairly against Holders of Scopac's Class 9 General Unsecured Claims. The Holders of those Claims will receive a share in the Scopac Litigation Trust recoveries on par with other Holders of General Unsecured Claims. The proposed classification structure and treatment of Classes 8 (Scopac Trade Claims) and 9 (Scopac General Unsecured Claims) is necessary to provide for Newco's paramount interest in continuing to transact business with Scopac Trade Creditors, as detailed above. Thus, the Bankruptcy Court found no unfair discrimination. [Confirmation Findings at p. 112].

The MRC/Marathon Plan is narrowly tailored in that it provides for a small amount of funds to supplement to the Scopac Trade Creditors' recovery while also providing a separate Litigation Trust run by the Indenture Trustee for the benefit of Scopac's general unsecured creditors. This is a reasonable, good faith solution that allows the holders of Scopac General Unsecured Claims to recover on par with similarly situated creditors (i.e., the Scopac

---

[18]    Interestingly, Beal Bank made many of the same arguments in that case (right to credit bid, value, best interest, artificial impairment, classification, good faith) as the Indenture Trustee makes here. The Court rejected those claims, and described Beal as making an "everything but the kitchen sink attack." *Beal Bank*, 248 B.R. at 688.

Trade Creditors) after accounting for the paramount importance of trade creditors who have a continuing interest in the viability of the Reorganized Entities.

### 8. The Indenture Trustee Is Not Likely To Succeed In Demonstrating That The Exculpation Clause In The MRC/Marathon Plan Violates The Bankruptcy Code

The Indenture Trustee objects to the release and exculpation provisions of the MRC/Marathon Plan, claiming that they violate section 524(e) of the Bankruptcy Code. The only parties receiving this protection under the MRC/Marathon Plan are the MRC, Marathon, the Reorganized Entities, the Committee, and their respective officers, directors, professionals, members, agents and employees. Further, the exculpation clause specifically excludes liability based on gross negligence or willful misconduct. This is a standard plan provision. Indeed, the United States Trustee did not object to this narrowly tailored exculpation provision.

Courts have recognized some or all of following factors when considering non-consensual third-party releases: (i) an identity of interest between the debtor and the third party; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization; (iv) whether substantial majority of creditors support on issuance of injunction; and (v) whether the plan provides for all or substantially all of the claims affected by the injunction. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2nd Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070 (1993); *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376 (1989); *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000); *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994).

First, there is an identity of interests between the MRC and Marathon and the Reorganized Entities – Newco and Townco. MRC and Marathon will invest $580 million for the benefit of creditors of the estates, giving them recoveries above and beyond what they would

34

otherwise receive from the Debtors' assets. In exchange, they will become the owners of Newco and Townco, both of which will emerge from Chapter 11 under the MRC/Marathon Plan as reorganized debtors discharged of the claims and obligations asserted against the Debtors. If a sole disgruntled creditor of the Debtors could pursue the MRC and Marathon for matters arising out of the Debtors' bankruptcies, thereby reaching the assets of the Reorganized Entities, the discharge injunctions to protect the Reorganized Entities would be effectively meaningless.

Second, the contributions to be made by MRC and Marathon are clearly "substantial" in the context of these chapter 11 cases.

Third, the injunctions and releases are essential to the MRC and Marathon Plan. Without them, the MRC and Marathon, the Committee, and, indirectly, the Reorganized Entities will remain exposed to the very liabilities that the bankruptcy discharge is supposed to cover. The MRC and Marathon will not be willing to make the contributions contemplated in the MRC/Marathon Plan without such protection. Simply put, without the releases and injunctions, there would be no $580 million of cash infusion and no reorganization of the Debtors' business.

Fourth, the MRC/Marathon Plan received overwhelming creditor support. The Noteholders remain the lone dissenter.

Furthermore, the fact that none of the Non-Debtor Released and Exculpated Parties are officers and directors of the Debtors who may be tainted by any prior misconduct is significant. This is distinguishable from situations where the non-debtor parties seeking releases through bankruptcy have actively managed the debtors' affairs and have exposure to creditor claims such as breach of fiduciary duties. Here, in contrast, the Non-Debtor Released and Exculpated Parties have made substantial, concrete contributions to the reorganization of the Debtors' businesses, as evidenced by the overwhelming support of creditors. The proposed releases and injunctions are

merely sought to protect the parties from baseless claims and attempts to circumvent the protection of bankruptcy discharge.

In approving the releases and exculpations in the MRC/Marathon Plan, the Bankruptcy Court made the following factual findings and legal conclusions regarding these provisions:

- they constitute good faith compromises in exchange for substantial consideration;

- they are fair and reasonable and necessary to effectuation of the MRC/Marathon Plan;

- they confer material benefits and are in the best interests of the Debtors, their estates, and their creditors; and

- they are consistent with the applicable provisions of the Bankruptcy Code and Fifth Circuit case law.

[Confirmation Findings at pp. 116-118]. The Bankruptcy Court was absolutely correct.

## II.    IF A STAY IS GRANTED, THE INDENTURE TRUSTEE MUST, AMONG OTHER THINGS, POST A BOND OF AT LEAST $176 MILLION

MRC and Marathon respectfully submit that the Indenture Trustee failed to establish the basis for a stay pending appeal of the Confirmation Order and, thus, the Bankruptcy Court did not abuse its discretion in denying a stay. If, however, this Court disagrees and grants a stay pending appeal, the Indenture Trustee must be required, as a condition to obtaining any stay, to post a substantial bond to protect MRC, Marathon, creditors and others who have worked tirelessly to confirm a plan that the Indenture Trustee seeks to dismantle. *See* Bankruptcy Rule 8005 (authorizing courts to condition stays on the posting of a bond). In addition, other protections delineated by the Bankruptcy Court would be necessary to ensure continued operations of the Debtors during the pendency of any stay.

As a matter of policy, bankruptcy courts do not typically grant stays without the posting of an adequate bond. *See Adelphia*, 361 B.R. at 350 ("In analyzing whether to order movants to post a bond in support of a stay pending an appeal of a bankruptcy court order, district courts

have obtained guidance from Federal Rule of Civil Procedure 62(d), which requires appellants to post a bond when appealing a lower court order absent 'exceptional circumstances.'"); *Tex. Equip.*, 283 B.R. at 228-29 (finding that the four element test to authorize a stay had been satisfied, "provided a bond is posted to protect Washington Mutual pending appeal."); *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990) ("There is in general a strong policy against granting stays without providing some security to the adverse party.").   Thus, the Bankruptcy Court, although denying a stay pending appeal, detailed what type of bond and other protections would be necessary should a stay pending appeal be granted.

Courts look to whether a bond is necessary to "protect against diminution in the value of property pending appeal," to "secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal," and to guarantee "the costs of delay incident to the appeal." *Adelphia*, 361 B.R. at 350 (citations omitted).   When a stay pending appeal will likely cause harm to the non-moving parties by diminishing the value of an estate or otherwise endangering a non-moving party's interest in their ultimate recovery from the estate, as is undoubtedly the case here, and there is no good reason not to require the posting of a bond, the "court should set a bond at or near the full amount of the potential harm to the non-moving parties." *Id.* at 368 (setting a $1.3 billion bond to cover harms arising during a contemplated seven-month stay, such as $490 million in interest, $260 million in underwriting fees, a loss of $450 million due to an IPO discount, various professional and accounting fees, etc.). [Stay Findings ¶ 36].

Specifically, the Bankruptcy Court recognized two types of risks that must be protected if the Confirmation Order were to be stayed pending appeal.   First, the continued viability and operation of the Debtors.   Second, protection against the substantial risk that the MRC/Marathon Plan will collapse during the pendency of a stay pending appeal. [Stay Findings ¶¶ 34, 36].   As

37

to the first, the Bankruptcy Court stated that the Indenture Trustee must provide: (i) $25 million in financing to Scopac, repayment of which would come from the $513.6 million due to the Noteholders under the MRC/Marathon Plan, (ii) $5 million in subordinated financing to Palco, and (iii) discounted logs from Scopac to Palco as proposed by the Indenture Trustee during the Stay Hearing.  [Stay Finding ¶¶ 40-41].[19]

It is important to note that during the Stay Hearing, MRC and Marathon requested a bond in the amount of over $400 million and the Indenture Trustee argued that no bond should be required, and that the discounted log program and $25 million of DIP financing would suffice. The Indenture Trustee completely ignored the risk that MRC and/or Marathon would be unable or unwilling to consummate the transaction if a stay was imposed.  Thus, the Bankruptcy Court properly concluded that a substantial bond was necessary.

As to the amount of a bond necessary to protect against the significant risk that MRC and Marathon may not proceed with the MRC/Marathon Plan if there is a delay from a stay pending appeal, the Bankruptcy Court, based on the evidence presented, determined that it should be $176 million, calculated as follows:

- $10.6  million due unsecured creditors under MRC/Marathon Plan

- $ 0.5  million funding of the Litigation Trust under MRC/Marathon Plan

- $ 28.5  million claim of PBGC satisfied under MRC/Marathon Plan

- $ 11.6 million estimated accrued and unpaid administrative and priority claims paid under MRC/Marathon Plan (appellees argued this amount should be $26.6 million, however the DIP facility pays approximately $15 million of these claims)

- $ 6.3  million in additional administrative claims incurred during a stay

---

[19]  The Indenture Trustee consented to the $25 million financing and the discounted logs.  However, because the evidence was unclear as to whether these protections would violate the Scopac Indenture, the Bankruptcy Court also stated that a legal opinion on this issue from **independent counsel** would be required.  [Stay Findings ¶¶ 41, 47 (emphasis added)].  The Indenture Trustee fails to mention whether it can obtain such an opinion.

- $ 1.0  million estimated employee bonus plan compensation

- $ 44.0 million estimated reduction of Palco going concern to liquidation value (this amount is reduced from the $88 million requested because the court is not prepared to find the difference in value to be as high as argued by MRC/Marathon)

- $ 9.5  million for backlogged road work and potential regulatory Fines (reduced from $14.5 million requested by MRC/Marathon because the DIP budget includes $5 million in roadwork)

- $ 29.0 million in risk to MRC of increased interest rate of 100 basis points during pendency of appeal (at present value over a 14 year loan) (reduced from original request of $86 million based on a maximum of 300 basis points increase in interest during pendency of appeal because any amount over 100 basis points would be speculative.)

- $141.0 million total[20]

[Stay Findings  ¶ 45].  The Bankruptcy Court went on to state that:

> [i]n determining an amount of a bond, courts often multiply the estimate of actual damages by 125% or 150% to account for additional unforeseeable risk.  Such additional bond is necessary in this case due to the risks to operations, the environment, the employees and the town economy from a stay pending appeal. Further, there is additional risk because during the pendency of the appeal, current management intends to harvest more redwood inventory than MRC would harvest if it were operating the Timberlands, thereby impacting MRC's business plan.  There also exists the risk of decline in value of the auction rate securities. Further, a key employee has recently left and there is the risk of loss of other employees and customers.  multiplying the $141 million by 125% totals approximately $176 million.

[Stay Finding ¶ 46].

   In determining that the amount of the bond should be $176 million, the Bankruptcy Court considered that the Indenture Trustee did not argue that the Noteholders would be unable to post a bond of several hundred million dollars or that doing so would constitute a hardship.  The Noteholders are predominately well capitalized, sophisticated financial entities.  [Stay Findings ¶

---

[20] The total actually is $140 million.

44]. Based on the evidence presented, the Bankruptcy Court made a detailed factual finding as to the appropriate amount of any bond and other security. These findings are neither clearly erroneous nor an abuse of discretion.

## CONCLUSION

WHEREFORE, MRC, Marathon and the Committee respectfully request that this Court (i) deny the Motion for a stay pending appeal or, in the alternative, grant the Motion conditioned on the Indenture Trustee posting a bond in an amount not less than $176 million, and providing the additional security detailed in the Bankruptcy Court's Stay Findings.; and (ii) grant such other and further relief as this Court deems just and proper.

July 18, 2008

**HAYNES AND BOONE, LLP**

_/s/ John D. Penn_
John D. Penn
Texas State Bar No. 15752300
Trey A. Monsour
Texas State Bar No. 14277200
201 Main Street, Suite 2200
Fort Worth, Texas 76102
Telephone: (817) 347-6610
Telecopy: (817) 348-2300

-and-

**WINSTON & STRAWN LLP**

_/s/ David Neier_
David Neier
Steven M. Schwartz
Carey D. Schreiber
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Telecopy: (212) 294-4700

**COUNSEL TO MARATHON
STRUCTURED FINANCE FUND L.P.**

**PACHULSKI STANG ZIEHL &
JONES LLP**

_/s/ John D. Fiero_
John D. Fiero
Maxim B. Litvak (TX Bar No.
24002482)
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: (415) 263-7000
Facsimile: (415) 263-7010

**COUNSEL FOR THE OFFICIAL
UNSECURED CREDITORS'
COMMITTEE**

**PERKINS COIE LLP**

Kenneth M. Crane
Peter G. Lawrence
131 South Dearborn Street, Suite 1700
Chicago IL 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400

-and-

**GOODWIN PROCTER LLP**

_/s/ Allan S. Brilliant_
Allan S. Brilliant
Brian D. Hail
Craig P. Druehl
620 Eighth Avenue
New York, New York 10018-1405
Telephone: (212) 813-8800
Facsimile: (212) 388-3333

**COUNSEL TO MENDOCINO REDWOOD
COMPANY, LLC**

NY:1190832.1